SHALL *v.* DETROIT & MACKINAC RAILWAY CO.[1]

<div style="float:right; border:1px solid">152   463<br>f153 ³319</div>

1. RAILROADS — NEGLIGENCE — PERSON WORKING ABOUT CARS — DEATH—CONTRIBUTORY NEGLIGENCE.

Plaintiff's intestate, one of 100 laborers engaged in dismantling and tearing down a sugar factory, was killed while working between two railroad cars upon a track within the building, in consequence of other cars being backed against them by defendant railroad company's locomotive. The laborers in the building were making considerable noise and there was nothing to warn deceased and his companions of the approach of the train, other than the noise of the train itself. There was evidence that the train was backing faster than usual, and that it did not stop as was customary just outside the building before backing in. *Held*, that it could not be said, as a matter of law, that deceased was guilty of contributory negligence.

2. SAME—ASSUMPTION OF RISK—EVIDENCE—ADMISSIBILITY.

Evidence that the conductor was in the habit of stopping the train outside the building and warning those within of its approach was competent to show, in the absence of express instructions as to warning, the manner in which the work had been conducted, as justifying deceased's reliance upon the custom and negativing his assumption of the risk.

3. DEATH—DAMAGES—CHARACTER OF DECEASED—EVIDENCE—ADMISSIBILITY.

In an action for death deceased's habits of industry may be shown as proper evidence of damages. *McQuisten v. Railway Co.*, 150 Mich. 332, distinguished.

4. RAILROADS — CONTRIBUTORY NEGLIGENCE — KNOWLEDGE OF DANGER.

Evidence that deceased knew the engine was coming soon to take out the loaded cars is not conclusive that he knew the train was then approaching so as to charge him with contributory negligence.

5. MASTER AND SERVANT—NEGLIGENCE OF SERVANT—INJURIES TO THIRD PERSONS—LIABILITY OF MASTER.

A railroad company is liable for the death of a servant of a contractor engaged in dismantling a factory, caused by the

---

[1] Rehearing denied June 27, 1908.

negligence of train operatives while switching cars in the dismantled building, the contractor's superintendent and foreman having no control over the train operatives further than to inform them of what work they wanted done.

6. SAME—WARNING—WAIVER.

The act of the contractor's foreman in telling the trainmen to come on was not a waiver of the customary warning or of the customary stop before entering the building.

Error to Iosco; Connine, J. Submitted February 20, 1908. (Docket No. 70.) Decided May 1, 1908.

Case by Sophia Shall, administratrix of the estate of Alexander Shall, deceased, against the Detroit & Mackinac Railway Company for the negligent killing of plaintiff's intestate. There was judgment for plaintiff, and defendant brings error. Affirmed.

*Charles R. Henry* (*James McNamara*, of counsel), for appellant.

*De Vere Hall* (*N. C. Hartingh*, of counsel), for appellee.

The following statement of the case is taken from the defendant's brief and is conceded by counsel for the plaintiff to be substantially correct:

"On the 17th day of April, 1906, Alexander Shall, while employed by the Kilby Manufacturing Co., at East Tawas, Michigan, in assisting in tearing down and dismantling the factory belonging to the Tawas Sugar Company, met death in the following manner:

"The structure and material of which the Tawas Sugar Factory was made, and the machinery therein, was being taken down and apart, and loaded on cars, for the purpose of shipping the same out of the State, and the Kilby Manufacturing Co. had been employed by the Tawas Sugar Company to do the work. For the convenience of the Kilby Manufacturing Co. in so removing said material, two temporary railroad tracks were laid inside of the building being removed, one known as the north track and the other as the south track; both tracks leading out

of the building to a common spur connected with the main track of the Detroit & Mackinac Railway Company.

"Prior to April 17, 1906, the Detroit & Mackinac Railway Company had repeatedly operated its engines and cars on and over the tracks so constructed in said building, and was daily in the habit of taking out loaded cars, shifting cars partly loaded and otherwise, and leaving, where required, empty cars to be loaded, and had taken out and carried away on its main track to its destination, many cars loaded with the material of said factory so being removed.

"Robert Grisdale was foreman, and had general charge of the work in moving said material for the Kilby Manufacturing Co., and cars were placed in said building and moved from place to place and taken out under his direction. Sometimes, however, Mr. Shepard, general superintendent of the Kilby Manufacturing Co., would direct that a car be moved from one track to another.

"The employés of the railway company had no information or direction as to what they were to do around the premises of the sugar factory until they arrived at the premises and then took their instructions and directions from Mr. Grisdale, the foreman, or Mr. Shepard, the general superintendent.

"As the two tracks referred to were constructed to the building, there was a sharp little pitch, or up grade, of about two or three feet, just before the tracks entered the factory, on each track, and a curve in the south track to the north, at a place where it diverged from the north track. The building itself was 66 feet wide and 258 feet long, and on the day in question, the walls of the south side were torn down, but a pile of brick and mortar lay through the entire length of the building. In tearing the building down they had used a battering ram to knock down the brick and mortar walls, and this loose material was strewn throughout the building and outside of the building, along by the tracks where they entered the building. The floor of the building was unevenly covered with debris of the dismantled building; on the north side of the south track this debris was two and one-half feet high, running from the north rail of the south track to the top of the pile of debris. There was all kinds of stuff, three or four feet deep in places, and uneven. They had a kind of path alongside of the rail.

"On the morning referred to Joseph Flint and Joseph

152 MICH.—30.

Stepanski, as train crew, and Charles Dimmick and Charles Bigelow as engine crew, left the car shops of the Detroit & Mackinac Railway Company, at East Tawas, with engine, tender and some empty cars, for the sugar factory, with instructions from the railway company to deliver them to the Kilby Company to be loaded. They were instructed to leave the cars where the Kilby Company should direct, and to bring back such loaded cars as should be ready for shipment. Whereupon, the train crew so made up and instructed, proceeded to the sugar factory, a short distance, to execute its orders. The several members of the crew were experienced train men. On arriving at the factory, Mr. Flint, who had charge of the train, was told by the foreman, Mr. Grisdale, not to go in on the south track first, but to go over on the north track and take out two cars and put in an empty car. This was done, after which the crew returned to the south track. There were two loaded cars on the outside of the building on the south track; these they disposed of and hooked onto an empty gondola which was on the south switch. This switching on the south track, before attempting to go into the building, took about ten minutes. Mr. Flint then inquired of Mr. Grisdale, 'If everything was ready on the south track,' to which Grisdale, the foreman of the Kilby Manufacturing Co., replied: 'Yes, sir; come right in.' Mr. Shepard, superintendent of the Kilby Co., stood there at the time, and said: 'Come on,' and made a motion with his hand. Mr. Grisdale's testimony as to what was said is as follows:

" 'The conductor [Flint] hollered to me if we were all ready. The answer I gave him was, "Yes; I think we are. Come on." '

"At this time the train consisted of the engine, two loaded box cars and one empty gondola car, the last-named car being at the end farthest from the engine. At this time the train crew could see no one working on or being near the south track in the building where they were about to go. Grisdale was in a position where he could look down the track and see if it was clear. When the train crew started in to do the switching from the south track, there were two cars in the building; one loaded standing at the west end of the south track, and the other partly loaded, just east of it, and 'tight up against the loaded car.' The loaded car to the west had in the bottom beams, girders and columns, on top of

which was a sugar pan 10 or 12 feet in diameter, with a circular top, with a dome about six feet high, extending about 14 feet above the floor. This dome extended above and about two or three feet to the east of a girder forming part of the structure of the second floor. Knowing that the impact of the coupling to take out these cars would likely drive the loaded car against the girder and do some damage, an effort was made to move the partly loaded car, to the east, away from the loaded car. This they attempted in two ways: First, they endeavored to move the car with pinch bars, but not being able to do so, they employed the use of a steam derrick which was in operation in the building, and while so moving it about five feet, Alexander Shall was between the cars, assisting with his pinch bar. Associated with Shall in attempting to move the car was Otto Zolweg and their immediate foreman, Reddy McFarland. While Shall and Zolweg were between the cars, Shall holding his pinch bar, and Zolweg a rope and pinch bar connected with the derrick, with their foreman standing by the side of the track near them, directing their work, the train backed in (with the brakeman on the rear car to make the coupling) and struck the partly loaded car, thereby driving it back against the loaded car, Alexander Shall being between the two cars (the loaded car and the partially loaded car) was caught between the dead heads and killed. At the time Shall was struck between the cars, he was not operating his pinch bar. Shall and Zolweg had been informed that the engine was coming in to take out the loaded car, and they knew that in order to take that out, they would have to take both cars out. The purpose of their work between the cars was to enable the moving of the cars by the train crew. Zolweg excuses their conduct in being between the cars at the time of the impact, by saying:

" 'I thought Reddy would tell us if the train came closer, to get out. Reddy is McFarland. We depended on him to give notice when the train came. He gave us notice, but it was too late."

"There were about one hundred men working about the building. There was nothing to apprise any one connected with the operation of the train, that Alexander Shall, or any one else, was between the cars.

"The accident, which resulted in the death of Alexander Shall, happened in the morning of the 17th day of April, 1906. The deceased was a laboring man, 35 years

of age, and the line of his work in dismantling the factory was in connection with the loading of cars.

" On the following August, Sophia Shall, widow and administratrix, brought suit against the Detroit & Mackinac Railway Company by declaration, alleging:

" ' On the 17th day of April, 1906, at said city of East Tawas, and while said intestate was in the exercise of due and reasonable care, and without fault or negligence on his part, was engaged in loading one of said cars so placed, and employed in and about said car, without giving notice or warning to intestate, or such employés so engaged in loading such car, defendant carelessly, negligently and wrongfully did cause its locomotive engine to run down upon said spur track and against the car so being loaded with such material by said intestate and such other employés, and about which he then was so employed, causing other cars to back against said car, striking it and other such cars with great force, causing the same to move suddenly and violently backward against intestate, and catching and crushing intestate between the ends of two of said cars, about which he was so employed,' etc.

" The sole element of negligence complained of in the declaration was the failure on the part of the defendant to give to Alexander Shall ' notice or warning' of the approach of the train. The speed of the train is not complained of, and the circuit judge, in his charge to the jury, in referring to the negligence at issue, said:

" ' Now, the particular negligence relied upon in this case, and set up, is the backing in of this train, into this building, without giving warning or signals of the approach of the train. Now, if the plaintiff recovers, she can only recover by proving that negligence; she can only recover upon the negligence alleged and set up, and cannot recover upon any other.

" ' The excessive speed of the train, if it was excessive, is not set up as a ground of recovery; it is not set up as negligence in this case, and it would not in this case alone constitute negligence,' " etc.

Verdict and judgment for plaintiff.

Counsel for plaintiff suggest one correction to the above statement, and to that correction we think they are entitled. Counsel for defendants state:

" Grisdale was in a position where he could look down the track and see if it was clear."

It clearly appears from Grisdale's testimony that he was not in a position to see the deceased behind the car. He testified:

"I could not see from where I stood that he was between the two cars, and I do not think it could have been seen by the train crew."

Grisdale went to the switch which was some distance outside the building. That was his custom. He told them in reply to a question by the conductor that "they were all right, and to come on." The train then backed in. Grisdale testified:

"I started back with the train; I had my hand on it,— on the truss rods of the box car. I went back with the train until we struck the main building. The track was obstructed there by bricks and stuff, and I could not go any farther. I saw that the train was going pretty rapid, and I signaled them to stop. They did not stop until after they hit the other cars."

GRANT, C. J. (*after stating the facts*). Under the above statement, it is clear that there was evidence that Mr. Shall was working between the two cars and could not be seen by either Grisdale or any of the crew on the train. Some one owed a duty to warn him of the approach of the train, unless (1) he knew or should have known that the train was approaching on account of the noise that it made; or (2) that it was the custom to back trains in without any warning, and that therefore he assumed the risk.

There was evidence that the deceased and Zolweg were engaged in customary and necessary work, and that they expected notice to be given to them of the approach of the train. Zolweg testified that he expected McFarland, a subforeman of the Kilby Manufacturing Company, to give them warning, and that he did.give warning, but too late for Shall to step into a place of safety. It does not appear that McFarland had ever before given warning, or that he had been instructed to give it. He would

naturally give warning when he saw danger impending, and undoubtedly did in this case as soon as he saw it. He was directing and assisting in the work in which Shall and Zolweg were engaged. It was essential to give warning to him so that he might communicate it to the others. But there is no evidence that he was notified, or that any one cried out, as it was the custom, that the train was approaching. There is evidence on the part of the plaintiff showing that McFarland stood three or four feet from the car track on some debris; that he was in position where he could have seen the train coming if he had been looking, but that he was looking at Shall and Zolweg doing the work.

One witness testified:

"When I last saw McFarland before the accident he stood with his face about half turned, * * * was looking at his men at the work."

Another witness on the part of the plaintiff testified that McFarland was part of the time between the cars and part of the time close by directing the work when the accident happened. This witness testified that he was the first that said anything, and that when he saw the train within 25 or 30 feet of the car behind which Shall was, "I hollered, 'For God's sake, boys, get out of there!' and when I hollered I thought all three were in a bunch, —McFarland, Otto and Aleck."

There were 100 workmen in the building. Evidently they were making considerable noise. It appears there was nothing to warn Shall and Zolweg of the approach of the train aside from the noise of the train itself. There was evidence that the train was backing in faster than usual, and that it did not stop as was customary just outside the building before backing in. Under these circumstances it cannot be said as a matter of law that the deceased was guilty of contributory negligence.

Whether Shall assumed the risk depends upon the manner in which trains had been operated for the three

months previous. There was evidence tending to show that the conductor (Mr. Flint) was in the habit of stopping the train outside the building, walking down either on the track or on the outside, and "generally hollering to the boys, and saying 'Look out, boys, the train is coming in, and I am going to take these cars out.'" This testimony does not appear to have been offered, or permitted to be used, as evidence of the negligent act of the train crew at the time of the accident. It was competent to show, in the absence of express instructions as to warning, the manner in which the work had been conducted. If it had been customary for the conductor to stop his train and to give a warning of its approach, those at work in the building had the right to rely upon such customary warning. They had as much right to expect a warning under these circumstances as they would if express instructions had been given to warn them. The admission of the testimony for the purpose to which it was confined was not error. It was competent evidence that Shall did not assume the risk.

Complaint is made of the introduction of evidence as to the deceased's habits of industry. It is contended that this had no legitimate bearing upon the question of damages. Among the facts and circumstances laid down by text writers and numerous authorities as proper evidence of damages, are the deceased's habits of industry, sobriety, etc. 1 Joyce on Damages, § 563; 6 Thompson on Law of Negligence, § 7129; 4 Sutherland on Damages (3d Ed.), § 1268; *Spaulding* v. *Railway Co.*, 98 Iowa, 205; *Hunn* v. *Railroad Co.*, 78 Mich. 513, 527 (7 L. R. A. 500).

Counsel for the defendant cite and rely upon *McQuisten* v. *Railway Co.*, 150 Mich. 332. The question there objected to was, "What do you know, if anything, about his (plaintiff's) being a careful, prudent man?" The testimony was evidently introduced for the purpose of affecting the question of contributory negligence. I have examined the briefs and record in that case and find that there is no suggestion in the plaintiff's brief that the testi-

mony was admissible as affecting the question of damages. There is nothing in the record to show that such claim was made on the trial. The suggestion must have been made in the oral argument, as it does not appear in the brief. The entire argument in the brief of counsel for plaintiff upon this point was to show that the testimony was harmless and unprejudicial, while the entire argument on the part of the defendant was to show that it was incompetent as bearing upon the question of contributory negligence. The court in its charge to the jury made no reference whatever to the habits of the deceased as a measure of damages. What we there said as to its being admissible upon the question of damages is dictum.

It is urged that the deceased had been informed that the train was approaching. If this was so, then the deceased was clearly guilty of contributory negligence. This claim is based upon the testimony of Mr. Zolweg. His testimony is as follows:

"While I was doing that work, Mr. Shall and me, both of us had been informed that the engine was coming in to take that car out, that loaded car; we knew that in order to take out that loaded car they would have to take out the car that was partly loaded, they would have to take them both out."

It does not follow from this testimony that Zolweg and deceased understood that the train was then approaching. It is entirely consistent with the idea that they knew it was coming in soon to take out the cars, for whose removal they were making preparations. We cannot on this testimony say that it was conclusively shown that Shall had been informed of the approaching train and the immediate danger consequent thereon.

Counsel for defendant strenuously urge that the Kilby Manufacturing Company is the negligent party if there is any negligence. As above stated, there is evidence of a custom on the part of the defendant to give warning, and that it was not the custom of the Kilby Manufacturing Co. to give warning. The manager of the Kilby

Manufacturing Co. notified the conductor of the defendant's trains of the work he wanted done. The conductor himself testified that after getting such information from the foreman of the manufacturing company, he controlled the movement of the cars. We cannot say under this evidence as a matter of law that the warning of Grisdale, foreman of the manufacturing company, to the engineer to come on, was a waiver of the customary warning or of the customary stop before entering the building. This case is very similar to *Fitzpatrick* v. *Railroad Co.*, 149 Mich. 194, and we think is controlled by that case.

Judgment affirmed.

BLAIR, MONTGOMERY, OSTRANDER, and MOORE, JJ., concurred.